COMMONWEALTH *vs.* NICOLA V. DIGIAMBATTISTA.

No. 11-P-1919.

Suffolk. November 16, 2012. - January 25, 2013.

Present: GRASSO, VUONO, & MILKEY, JJ.

*Indecent Assault and Battery. Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voluntariness of confession.

A Superior Court judge erred in allowing the criminal defendant's pretrial motion to suppress statements he made to police, where the defendant made a knowing, intelligent, and voluntary waiver of the Miranda rights, and where the Commonwealth met its burden of proving that the defendant's subsequent statements were given voluntarily, in that nothing in the record showed that the defendant's will was overborne by the circumstances surrounding the giving of his confession. [183-189]

COMPLAINT received and sworn to in the Chelsea Division of the District Court Department on November 15, 2010.

A pretrial motion to suppress evidence was heard by *D. Dunbar Livingston*, J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina*, J., in the Supreme Judicial Court for the county of Suffolk, and the case was reported by him to the Appeals Court.

*Allison Callahan*, Assistant District Attorney, for the Commonwealth.

*Edward Crane* for the defendant.

MILKEY, J. After making various incriminating statements to the Revere police, the defendant was charged with three counts of indecent assault and battery on a person fourteen or older (his stepdaughter). G. L. c. 265, § 13H. He then moved to suppress those statements as involuntary. Following an evidentiary hearing, a District Court judge allowed the motion to suppress,

explaining his reasoning in a detailed and thoughtful opinion. The Commonwealth obtained approval to pursue an interlocutory appeal. Because we agree with the Commonwealth that the motion judge misapplied the relevant legal principles, we reverse.

*Standard of review.* The key evidence before the judge was the video recording of the defendant's interview. That recording speaks for itself, and the essential subsidiary facts necessary to resolve the motion to suppress are thus uncontested. Although the judge relied on his observations of what that recording revealed, he made no specific findings on this, apparently cognizant that an appellate court is "in the same position as [him] in viewing the [video recording]." *Commonwealth* v. *Novo*, 442 Mass. 262, 266 (2004) (citation omitted). The judge did make factual findings as to the background facts and what transpired outside the interview room. We accept those findings unless they are clearly erroneous (which they have not been shown to be). See *Commonwealth* v. *Welch*, 420 Mass. 646, 651 (1995). The factual statements set forth below are drawn from those findings and our own observation of the video recording. We are to "make an independent determination of the correctness of the judge's application of constitutional principles to the facts." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996).

*Background.* After interviewing the defendant's stepdaughter regarding her allegations, Revere police contacted the defendant by telephone on Friday, November 12, 2010, and invited him to come speak with them about the allegations. The defendant accepted that offer, and he went to the Revere police station that afternoon. He acknowledged during his interview that he had become aware of his stepdaughter's allegations on the previous Monday, four days earlier.

At the police station, Detective John Cannon greeted the defendant and brought him to the office of Sergeant Steven Pisano, the supervisor of the detective bureau. There, Pisano and Cannon conducted a "preinterview" that lasted four to seven minutes. During this initial meeting, which was not recorded, the detectives obtained some biographical information from the defendant, and they used this preliminary encounter to gauge his mental state. The judge found, and the defendant does not contest, that "Pisano did not have any difficulty communicat-

ing with the defendant," that the defendant "was not under the influence of drugs or alcohol," and that the defendant "appeared to be concerned and attentive . . . [and] to understand that it was a 'serious situation.' " Although the detectives stated that they were investigating his stepdaughter's allegations of sexual assault, they did not question the defendant about those allegations during the initial meeting.

The defendant was then brought to a dedicated interview room that was equipped with video equipment. The entire interview, which lasted approximately forty-three minutes, was recorded (and a copy is before us). We summarize the over-all course of the interview, reserving further detail for later discussion.

The detectives did not begin to address the substance of the stepdaughter's allegations until nine minutes into the interview, and the period before that involved mostly preliminary matters. The detectives began by going over the defendant's Miranda rights and having him sign a written waiver form. They also recounted for the record what had occurred during the pre-interview. Pisano, who took the lead throughout the interview, asked the defendant some basic background questions, and he established that the defendant was not currently under the influence of any drugs or alcohol, and had never been diagnosed with any mental illnesses.

During the first part of the interview, Pisano also set the stage for the substantive questioning that was to follow. He went over the nature of the defendant's predicament and the choices the defendant faced, and he implored the defendant to tell the truth. Pisano finally raised the stepdaughter's specific allegations that, about two weeks earlier, the defendant, while intoxicated, touched her underneath her bra and then down the front of her pants. Pisano then turned the floor over to the defendant to respond. This was thirteen minutes into the interview.

After a bit of hemming and hawing, the defendant said, "Yes, I do believe that [my stepdaughter] is telling the truth. And I . . . may have been drinking and that's what probably caused me to touch her inappropriately. You know, I didn't mean anything by it." However, while accepting his stepdaughter's allegations as true, the defendant then began to disavow personal knowledge

of the events, claiming that he did not remember touching his stepdaughter in the alleged manner. Pisano repeatedly pressed the defendant on this, leading the defendant eventually to state — with regard to the specific allegations that he touched his stepdaughter underneath her bra — "I might have grabbed her . . . I grabbed her underneath . . . I'll say that." This prompted Pisano to state, "Don't say it like you're saying it for us. Did you? If you didn't do it, you didn't do it." The defendant responded, "I'm saying that I did, and I'm saying that I need help."

After briefly discussing the extent of the defendant's drinking problem, Pisano turned to the stepdaughter's allegation that the defendant had reached down her pants and touched her in the vaginal area. The defendant disavowed any specific memory of doing this, and Pisano spent much of the remainder of the interview trying to get the defendant to change his stated position on this. The defendant never did admit that he remembered the vaginal touching. He did acknowledge that he knew that his behavior was wrong, and he affirmatively responded to Pisano's general statement that the stepdaughter was "not lying . . . [but] telling the truth." At that point, Pisano stated his view that the defendant had just admitted to all the allegations, and the interview wound to a close.

*Discussion.* The judge concluded that the defendant did in fact make "a knowing[,] intelligent and voluntary waiver of his *Miranda* rights." The defendant argues, albeit in passing, that this conclusion is undercut by the fact that the four- to seven-minute preinterview was not recorded. There is no merit to this argument. The police went over the defendant's Miranda rights in detail during the taped interview, and the defendant acknowledged at that time the limited nature of the preinterview (including that the police had made no promises or threats, nor had asked him to speak to his stepdaughter's allegations). In short, there is no reason to doubt that the defendant's Miranda waiver was anything other than voluntary, knowing, and intelligent.[1]

Of course, even with a valid Miranda waiver, any subsequent

---

[1]While making remarks during the taped interview that characterized the choices the defendant faced, Pisano indicated that he was repeating some

statements must still be given voluntarily. *Commonwealth* v. *Magee,* 423 Mass. 381, 387 (1996). The Commonwealth acknowledged that the defendant has raised a sufficient question about the voluntariness of his statements that it bears the burden of proving voluntariness beyond a reasonable doubt. See *Commonwealth* v. *Miller,* 68 Mass. App. Ct. 835, 841 (2007). "A statement is voluntary if it is the product of a 'rational intellect' and a 'free will.' " *Commonwealth* v. *Selby,* 420 Mass. 656, 662 (1995), quoting from *Commonwealth* v. *Davis,* 403 Mass. 575, 581 (1988). The essential question is "whether [the] defendant's will was overborne by the circumstances surrounding the giving of [his] confession." *Commonwealth* v. *Baye,* 462 Mass. 246, 255 (2012), quoting from *Dickerson* v. *United States,* 530 U.S. 428, 434 (2000). That inquiry requires an assessment of the "totality of the circumstances." *Commonwealth* v. *Selby, supra* at 663. Relevant factors include "promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Mandile,* 397 Mass. 410, 413 (1986). The cases also emphasize the over-all length of the interview. See, e.g., *Commonwealth* v. *O'Brian,* 445 Mass. 720, 728, cert. denied, 549 U.S. 898 (2006).

We begin by noting the absence of so many of the factors just listed. The defendant was an adult with some college education, and there was no reason to question his mental capacity.[2] From all appearances he "consistently had control over both his actions and mental faculties . . . [and] was sober, alert, oriented, and lucid" for the duration of the interview. *Commonwealth* v.

___

things he had already gone over in the brief preinterview. The judge made no specific findings about this, but for purposes of our review, we have assumed that the detectives did in fact make similar statements during the preinterview. None of these statements would have rendered the subsequent Miranda colloquy invalid.

[2] Although the record reveals that the defendant had a serious drinking problem, he specifically stated during the interview that he had not had a drink in five days.

*Durand,* 457 Mass. 574, 597 (2010).[3] Nor was this a case where the defendant was held for a lengthy period of time under difficult physical circumstances. Indeed, the entire interview was well under an hour even if the time spent in the preinterview is added. Compare *Commonwealth* v. *O'Brian, supra* (statements made during police interview that lasted "only" two and one-half hours determined not to be involuntary).

Before turning to the particulars of the judge's reasons for concluding that the defendant's statements were involuntarily made, we highlight the over-all trajectory of the interview. The defendant had become aware of his stepdaughter's allegations four days before he freely accepted the police's invitation to come tell his side of the story. Therefore, when he stepped into the interview room, he already had had considerable time to think about how he wanted to approach his predicament. Then, when the police turned over the floor to him to respond to the allegations, a mere thirteen minutes into the interview, the defendant did not offer any reasons as to why the stepdaughter might be lying or honestly mistaken. Instead, he stated his belief that she was telling the truth. In the half-hour that followed, the defendant specifically admitted to only one incident (touching his stepdaughter's breasts). The interview eventually came to a close when the defendant indicated that he agreed with Pisano's statement — phrased in general terms — that his stepdaughter was telling the truth (essentially the same admission he had made at the outset).[4]

---

[3]The judge sought to support his ruling by observing that "the defendant's emotional state changes" during the interview, that "[t]oward the middle of the interview, the defendant is sagging in his chair in a somewhat slumped position . . . [and that he] appears somewhat distraught thereafter." Having viewed the recorded interview several times, we discern no distinct or pronounced change in the defendant's "emotional state." In any event, it is hardly surprising or telling that a father admitting that he sexually assaulted his stepdaughter would appear "somewhat distraught."

[4]The judge characterized the path of the interview as follows: "Over the course of the interview, the defendant's response to the accusations essentially changed from agreeing that the victim must be telling the truth, but having no knowledge of the events, to the defendant agreeing that he may have done some of what the victim says but has no memory of it because of intoxication, to the defendant admitting to some of the specific accusations." While that characterization is not strictly inaccurate, it suggests that there was a more dramatic transformation in the defendant's responses than occurred.

The judge highlighted that, in imploring the defendant to tell the truth, Pisano equated this with the defendant's admitting to the stepdaughter's allegations. That is to some extent true, because Pisano made it clear that he believed the stepdaughter was telling the truth. As Pisano himself put it, especially in light of the fact that the stepdaughter still loved the defendant, "there is no reason for her to say this . . . if it wasn't true." From what appears before us, Pisano had every reason to believe that the stepdaughter was telling the truth. Moreover, Pisano specifically invited the defendant to convince him otherwise, immediately qualifying the just-quoted language by adding, "unless you could say, hey, Sergeant, I never did any such thing, and here's why I think she said it." There was nothing unfair in Pisano's recounting his honest assessment of the stepdaughter's allegations.[5] In this regard, we note that at no point during the interview did Pisano overstate the evidence of the defendant's guilt. Contrast *Commonwealth* v. *Jackson*, 377 Mass. 319, 328 n.8 (1979); *Commonwealth* v. *DiGiambattista*, 442 Mass. 423, 436 (2004).

The judge concluded that "Pisano played upon the defendant's emotions by suggesting that an admission would keep his family together and that to deny the accusation was in effect calling his step daughter a liar." We agree with the motion judge that, to some extent, Pisano could be said to have been seeking to play upon the defendant's emotions. Indeed, perhaps the most pointed example of this is one that the judge did not highlight: Pisano's portrayal of the defendant's conduct as a breach of the trust his stepdaughter had placed in him as a father. However, we disagree that Pisano's conduct crossed the line in this regard. Notably, none of the specific statements that Pisano made in trying to get the defendant to open up was untrue. For example, there was no falsity in Pisano's assertion that if the defendant were to deny his stepdaughter's allegations without offering an alternative explanation, this would be tantamount to calling her a liar. We see nothing untoward about

---

[5]Of course, Pisano's personal beliefs are ultimately irrelevant in proving the defendant's guilt. Whether some of Pisano's own statements should be redacted before the recording of the interview may ultimately be submitted at trial is not currently before us.

Pisano's encouraging the defendant not to put his stepdaughter through this. Compare *Commonwealth* v. *Berg*, 37 Mass. App. Ct. 200, 203-206 (1994) (statement ruled voluntary even where suspect knew that it would prevent his mother from being charged with crime).

The judge also concluded that Pisano engaged in improper "minimization" of the crimes.[6] Similarly, he concluded that Pisano suggested that if the defendant confessed to the crimes (as minimized), this would lead him to be able to get the help he needed for his alcohol problem, and that the matter could be resolved through the defendant's getting such help. Certainly, Pisano did make various statements that fairly can be portrayed as downplaying the defendant's culpability. For example, he accepted that the defendant's alcohol abuse might well be the cause of his alleged conduct, he repeatedly referred to that conduct as a "mistake" that the defendant may not have meant ("good people make mistakes, but they're still good people"), and at one point he characterized the defendant as having been merely a "little touchy feely." In addition, Pisano unquestionably did suggest to the defendant that decision makers in the criminal justice process likely would look favorably on his confessing, that doing so might serve the interests of getting this matter behind him, and that it could hurt him if people thought he was lying. For example, in pressing the defendant to show remorse, Pisano stated, "[T]hat's what they [presumably, prosecutors, judges, or juries] want to see."

At the same time, Pisano never led the defendant to believe that his intoxication was a legal defense. Contrast *Commonwealth* v. *Meehan*, 377 Mass. 552, 564-565 (1979), cert. dismissed, 445 U.S. 39 (1980); *Commonwealth* v. *DiGiambattista*, 442 Mass. at 436. To the contrary, Pisano stated that it was *not* a legal defense, repeatedly emphasized that the defendant would have to "face" the situation in any event, and noted his belief that the defendant

---

[6]See *Commonwealth* v. *DiGiambattista, supra* at 457 n.2 (Spina, J., dissenting) (referring to "[m]inimization" as "a 'soft-sell' technique in which the police interrogator tries to lull the suspect into a false sense of security by offering sympathy, tolerance, face-saving excuses, and even moral justification, by blaming a victim or accomplice, by citing extenuating circumstances, or by playing down the seriousness of the charges" [citation omitted]).

was going to be charged regardless.[7] In addition, Pisano made it clear throughout that he could not make the defendant any specific promises of leniency. For example, Pisano specifically told the defendant, "I can't promise you nothing except to bring the truth forward for you and to tell them that you cooperated and you . . . tried to be very honest with us."

On the whole, Pisano's statements fell within the general rule that "[a]n officer may suggest broadly that it would be 'better' for a suspect to tell the truth, may indicate that the person's cooperation would be brought to the attention of the public officials or others involved, or may state in general terms that cooperation has been considered favorably by the courts in the past." *Commonwealth* v. *Meehan, supra* at 564 (footnotes omitted). Compare *Commonwealth* v. *Johnson*, 463 Mass. 95, 105 (2012) (approving officer's statement to defendant, "I want to give you the opportunity today to get out in front of this").[8] To the extent that Pisano may have improperly minimized the significance of the defendant's acts, "the use of such tactics alone does not render statements made by the defendant involuntary. Rather, the relevant focus is on whether the defendant's will was overborne." *Commonwealth* v. *Durand*, 457 Mass. at 596. See *Commonwealth* v. *O'Brian*, 445 Mass. at 727, quoting from *Commonwealth* v. *Scoggins*, 439 Mass. 571, 577 (2003) (confession voluntary where "minimization was not combined with any false statement concerning the evidence or the strength of the Commonwealth's case, and the detective 'stopped short of making an assurance' regarding the benefits of confessing").

None of this is to say that the defendant necessarily would have made precisely the same admissions had the police not used their particular interview techniques. But whether the police were able to succeed in getting a suspect to admit to

---

[7]Specifically, Pisano stated: "I'm not going to put a story in your head, and I'm not going to give you something you should or shouldn't say; I'm telling you you should tell the truth for this, because there's plenty here to charge you, and you are going to be charged and you are going to have to face this thing." Such statements undercut the defendant's claim that Pisano communicated that the criminal charges would simply go away if the defendant confessed and sought help for his alcohol problem.

[8]Compare *Commonwealth* v. *DiGiambattista*, 442 Mass. at 436, and *Commonwealth* v. *Baye*, 462 Mass. at 258, with *Commonwealth* v. *Mandile*, 397 Mass. at 414-415, and *Commonwealth* v. *Ortiz*, 435 Mass. 569, 577-578 (2002).

more than he otherwise might have is not the issue. Instead, the question is whether the interview techniques were so unfair or oppressive as to deprive the suspect of his "rational intellect" and "free will." *Commonwealth* v. *Selby*, 420 Mass. at 662 (citation omitted). Viewing, as we must, the totality of the circumstances, we conclude that the Commonwealth has met its burden of demonstrating that the defendant's will was not overborne. This is especially apparent based on the defendant's readiness from the start to accept his stepdaughter's allegations as true.

One remaining issue bears comment. In trying to get the defendant to admit specific knowledge of the alleged vaginal touching, Pisano told the defendant that he would be in the "same trouble" if he admitted to this allegation, that it would be "the same charge" as touching her breasts, and that the touching of the two areas was "all the same act." Based on this, the defendant contends that Pisano provided misleading information about the specific legal consequences of admitting to the vaginal touching.[9] Compare *Commonwealth* v. *Novo*, 442 Mass. at 268-269 (statements ruled involuntary where police misstated defendant's right to testify). We need not resolve whether Pisano went too far in downplaying the legal import of such an admission, because any misstatements by Pisano on this score were ultimately of no apparent consequence; despite Pisano's best efforts, the defendant never specifically admitted to the vaginal touching. See *Commonwealth* v. *Durand*, 457 Mass. at 597-598.

*Order allowing motion to suppress reversed.*

---

[9]The two touchings would support the same charge, indecent assault and battery. However, if deemed separate acts, they would also support two counts of that charge. In fact, it appears that the defendant was separately charged for the vaginal touching.